# UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other Than Assigned Judge | Martin C. Ashman |
|---|---|---|---|
| Case Number | 00 C 4893 | Date | 12/22/2000 |
| Case Title | Federal Trade Commission, et al. v. Med Resorts Intl, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd-party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [use listing in "MOTION" box above]
(2) ☐ Brief in support of motion due _____
(3) ☐ Answer brief to motion due _____ Reply to answer brief due _____
(4) ☐ ☐ Ruling/Hearing on _____ set for _____ at _____
(5) ☐ Status hearing ☐ held ☐ continued to ☐ set for ☐ re-set for _____ at _____
(6) ☐ Pretrial conf. ☐ held ☐ continued to ☐ set for ☐ re-set for _____ at _____
(7) ☐ Trial ☐ Set for ☐ re-set for _____ at _____
(8) ☐ ☐ Bench Trial ☐ Jury Trial ☐ Hearing held and continued to _____ at _____
(9) ☐ This case is dismissed ☐ without ☐ with prejudice and without costs ☐ by agreement ☐ pursuant to
   ☐ FRCP 4(j) (failure to serve) ☐ General Rule 21 (want of prosecution) ☐ FRCP 41(a)(1) ☐ FRCP 41(a)(2)
(10) [X] [Other docket entry] Enter memorandum opinion and order. Oral argument held. This court orders the Receiver, Stephen T. Bobo, to deny Claveau's request for a tax liability distribution. Stephen T. Bobo temporary equity receiver's motion for direction regarding shareholder's claim for tax distribution [80-1] is granted. Claveau's motion to compel a tax distribution [92-1] is denied.
(11) [X] [For further detail see ☐ order on the reverse of [X] order attached to the original minute order form.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | 8 | |
| X | Notices mailed by judge's staff. | FILED FOR DOCKETING 00 DEC 26 PM 1:39 | DEC 27 2000 date docketed | Document # |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing dpty. initials | 100 |
| | Mail AO 450 form. | | | |
| X | Copy to judge/magistrate judge. | | 12/22/00 date mailed notice | |
| IS | courtroom deputy's Initials | Date/time received in central Clerk's Office | IS mailing dpty. initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEDERAL TRADE COMMISSION and )
COMMONWEALTH OF VIRGINIA, )
ex rel. Mark Earley, Attorney )
General of Virginia, )
)
      Plaintiffs, ) Case No. 00 C 4893
)
      v. ) Judge Castillo
)
MED RESORTS INTERNATIONAL, INC.; ) Magistrate Judge
WORLD CONNECTIONS, INC.; )    Martin C. Ashman
MEDITERRANEAN RESORTS, INC.; )
DESTINATIONS UNLIMITED OF )
DELAWARE, INC.; BAY FINANCIAL )
SERVICES, INC.; V-PAC, INC.; )
J. GEORGE CLAVEAU; and )
MARIANNE BORDEN-MYERS, )
)
      Defendants. )

## MEMORANDUM OPINION AND ORDER

Equity Receiver for the Corporate Defendants,[1] Stephen T. Bobo, filed a motion asking this Court for direction regarding shareholder J. George Claveau's claim for a tax liability distribution. The distribution would purportedly enable Claveau to pay federal and state income taxes on the income earned by two of the Corporate Defendants, Med Resorts International, Inc. ("MRII") and V-Pac, Inc., both of which have elected to receive

---

[1] The Corporate Defendants are Med Resorts International, Inc.; World Connections, Inc.; Mediterranean Resorts, Inc.; Destinations Unlimited of Delaware, Inc.; Bay Financial Services, Inc.; and V-Pac, Inc. All of these corporations have been under receivership since August 17, 2000, because of allegations of fraudulent and deceptive practices in violation of 15 U.S.C. § 45(a) and the Virginia Consumer Protection Act.

tax treatment under subchapter S of the Internal Revenue Code. The Receiver opposes the distribution because he believes that the distribution may jeopardize the ability of the Corporate Defendants to remain in operation. Litchfield Financial Corporation, an intervenor in this action, opposes the distribution on essentially the same ground.[2] For the following reasons, this Court orders the Receiver to deny Claveau's claim for a tax liability distribution.[3]

## I. Background

This motion presents a purported tax predicament, in a rather complex case, involving a sole shareholder who chose to have two of his corporations elect tax treatment under subchapter S of the Internal Revenue Code. The shareholder, Claveau, formed MRII in 1980 to sell vacation packages to consumers. Claveau intended to provide a service whereby consumers could travel to certain worldwide resort or hotel locations owned or leased by MRII in exchange for a membership fee. To generate more appeal to selected customers, Claveau also formed V-Pac to provide a vacation package that resembled a timeshare. In addition, Claveau formed several other entities to expand the services he offered, nearly all of these entities have received tax treatment

---

[2] The Federal Trade Commission, Commonwealth of Virginia, and Corporate Defendants took no position on this motion.

[3] All parties have consented to have this Court conduct any and all proceedings relating to the temporary restraining order entered on August 17, 2000, and the FTC's and Virginia's motion for a preliminary injunction. See 28 U.S.C. § 636(c); Local R. 73.1(c).

under subchapter C of the Internal Revenue Code. But at least two of Claveau's entities, MRII and V-Pac, have received tax treatment under subchapter S. Both of these S corporations earned substantial income in year 2000.

Claveau's decision to enter the travel industry was a success, at least from a financial point of view. As of July 2000, Claveau's individual companies employed over 700 people, served a member base of over 30,000 customers, and generated receipts upwards of $50 million per year. Projections were strong and continued expansion was planned.

As with any profitable business venture, the government must receive its share. For MRII and V-Pac, the burden of paying any tax liability fell on Claveau as a result of those corporations making the subchapter S election. To enable Claveau to pay the federal and state income taxes on the income earned by MRII and V-Pac, MRII and V-Pac would make year-end distributions to Claveau, which were recorded as compensation to Claveau. For instance, for year 2000, MRII set up a $2.2 million reserve for distribution to Claveau to pay the federal and state income taxes on income earned by MRII and V-Pac during the year.[4] Claveau informed this Court that for him to avoid any risk of tax penalties, MRII would need to distribute those funds to Claveau on or before December 31, 2000.

But before MRII made the $2.2 million distribution to

---

[4] It has been estimated that MRII and V-Pac will generate taxable income of at least $5 million during year 2000.

Claveau, the FTC and Virginia filed an Ex Parte Motion for Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, and Order to Show Cause Why a Preliminary Injunction Should Not Issue. The FTC and Virginia based their motion on numerous alleged violations of 15 U.S.C. § 45(a) and the Virginia Consumer Protection Act. On August 17, 2000, the Honorable Ruben Castillo granted the motion, enjoining the Corporate Defendants from committing further violations of 15 U.S.C. § 45(a), freezing the assets of the Corporate Defendants, and appointing a temporary receiver.

By agreement of the parties, these restrictions have remained in place through extensions of the TRO. Additionally, pursuant to a Stipulated Preliminary Injunction with Asset Freeze and Appointment of Receiver entered into on December 18, 2000, these restrictions will remain in place for the foreseeable future.

Consequently, instead of MRII's $2.2 million reserve being distributed to Claveau to enable him to pay the federal and state income taxes on the income earned by MRII and V-Pac, these funds have remained in the corporate coffer. With December 31, 2000, fast approaching and the asset freeze in place, Claveau claims that he faces the quandary of paying federal and state tax bills in excess of $2 million for income earned by MRII and V-Pac in year 2000, even though he did not receive any tax liability distributions from either corporation in 2000. Claveau argues that this outcome would be "fundamentally unfair," especially

considering the current strong financial position of the Corporate Defendants.

## II. **Discussion**

A brief explanation of the operation of subchapter S corporations under the Internal Revenue Code helps clarify the tax predicament presented by this motion. Since 1958, small corporations have enjoyed the advantages of the corporate form of organization without being subject to possible tax disadvantages associated with the corporate form by filing an election under subchapter S of the Internal Revenue Code. *See* 26 U.S.C. § 1361. Accordingly, shareholders of an S corporation benefit from the same liability shield as they would in a C corporation, but, unlike a C corporation, shareholders of an S corporation can avoid taxation at both the corporate and individual level (the "double tax"). "While the S election is in effect, [an S corporation] is not subject to the corporate income tax." Boris I. Bittker & James S. Eustice, Federal Income Taxation of Corporations and Shareholders § 6.01(2)(c) (7th ed. 2000).

For tax purposes, the S corporation files an annual information return, which allocates income, losses, deductions, and credits to the S corporation's shareholders on a per-share, per-day basis. *See id.* § 6.06(1)-(2). Corporate income is thereby passed-through to the shareholders, appearing on their individual returns. *See id.* One caveat: the tax liability for

any corporate income that is allocated to a shareholder must be paid by the shareholder whether or not any actual distribution is made. *See id.; see also Portage Plastics Co. v. United States*, 486 F.2d 632, 634 (7th Cir. 1973) (noting that the "primary reason" distributions were being made to the subchapter S corporation's shareholders was to enable the shareholders to meet their tax obligations brought about by the corporation's subchapter S election).

With this in mind, we confront the following two questions. First, should this Court modify the asset freeze to allow for the $2.2 million distribution to Claveau to enable him to pay the federal and state taxes on income earned by MRII and V-Pac? Second, notwithstanding the asset freeze, should the distribution be made considering section 13.1-653 of the Virginia Code and the pending litigation against MRII and the other Corporate Defendants?

### A. Asset Freeze

Section 13(b) of the Federal Trade Act authorizes the court to exercise the full breadth of its equitable power to preserve the possibility of effective final relief. *See FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 571-72 (7th Cir. 1989); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1026 (7th Cir. 1988); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984). At the interlocutory stage, this equitable power

includes both the ability to issue a preliminary injunction and to order an asset freeze. *See id.* The decision to grant such relief is within the discretion of the court. *See, e.g., Commodity Futures Trading Comm'n. v. Am. Metals Exch. Corp.*, 991 F.2d 71, 79-80 (3d Cir. 1993).

The ability to order an asset freeze derives from the court's equitable power to order consumer redress. *See FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 348 (9th Cir. 1989). Thus, an asset freeze is appropriate to the extent it is needed to assure that restitution would be available as a remedy to defrauded consumers if a finding is made that the defendants are in violation of 15 U.S.C. § 45(a) at the conclusion of proceedings. *See World Travel Vacation Brokers, Inc.*, 861 F.2d at 1031; *FTC v. Sage Seminars, Inc.*, No. C 95-2854 SBA, 1995 WL 798938, at *9 (N.D. Cal. Nov. 2, 1995). Restitution is certainly an appropriate remedy where the FTC proves such a case. *See id.*

With the filing of the Stipulated Preliminary Injunction with Asset Freeze and Appointment of Receiver, this case draws one step closer to finality. The parties stipulate that "[t]here is good cause to believe that Plaintiffs will ultimately succeed in establishing that Defendants . . . have engaged in and are likely to engage in the future in acts and practices that violate Section 5(a) of the FTC Act" and other federal and state laws. (Stipulated Prelim. Inj. Asset Freeze and Appointment of Receiver

at 2.) The parties also stipulate that "[t]here is good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for consumers in the form of monetary restitution will occur from the sale, transfer, or other disposition or concealment by Defendants of their assets . . . absent continuation of the asset freeze." (*Id.* at 2-3.) Despite this, Claveau argues that it would be "fundamentally unfair" for this Court to allow the asset freeze to remain in place as to him in the claimed amount. Either Claveau has no high degree of understanding of the effects that a restitution remedy could have on the Corporate Defendants pending the outcome of this litigation or Claveau simply is asking this Court to turn its eye away from the evidence of public injury.

At the outset, we have not received any evidence whatsoever from Claveau to substantiate (1) Claveau's version of the financial position of the Corporate Defendants, (2) Claveau's $2.2 million estimate of the expected tax bill of MRII and V-Pac, (3) Claveau's personal liability for MRII's and V-Pac's tax bill,[5] and (4) Claveau's inability to pay MRII's and V-Pac's tax bill with his own funds or other sources of income. Rather, Claveau has only set forth conclusory statements of what he thinks the facts are, even criticizing the Receiver's reliance on

---

[5] For example, Claveau has not even provided this Court with his personal income tax returns for previous years. These returns, for all we know, might show the existence of loss carryforwards or other losses from the Corporate Defendants or other enterprises that may offset Claveau's claimed tax liability.

certain financial statements without offering any evidence of his own.[6] For this reason alone, this Court denies Claveau's request for a distribution. But even if this Court assumes that Claveau will, in fact, be personally liable for MRII's and V-Pac's $2.2 million tax bill, that tax penalties will begin to accrue on December 31, 2000, and that Claveau does not have the funds to pay for any tax liability and penalties that accrue, the result does not change.

Financially, the Corporate Defendants are in the black--at least for now. The Corporate Defendants presently have a large membership base, totaling about 36,000 members. Some of these members have paid up to $12,995 for their vacation packages. Largely as a result of this revenue, as of November 2000, the Corporate Defendants had a cash balance of approximately $2.9 million.[7] In fact, the Corporate Defendants have generated positive cash flow since being placed under the supervision of the Receiver. (See Bobo Aff. ¶ 3.)

However, the Corporate Defendants have a considerable amount of liabilities, owing at least $7.9 million to Litchfield, a

---

[6] For instance, Claveau criticizes the Receiver's projected cash flow for year 2000 because the Receiver did not include the cash surrender value of certain insurance contracts. But Claveau has presented no evidence of such contracts. (See Bobo Aff. ¶ 12.)

[7] Although the total cash balance of the Corporate Defendants is approximately $4.9 million, Textron Financial Corporation has asserted a secured claim to $1,152,000 of this amount. (See Bobo Aff. ¶ 3.)

secured creditor.[8] (*See* Litchfield's Brief in Support of Receiver's Request that the Court Deny the Request by Defendant Claveau for a Tax Distribution at 10-11.) Furthermore, the Corporate Defendants are expected to have a negative cash flow of nearly $2 million in 2001. (*See* Mot. of Temporary Equity Receiver for Direction Regarding Shareholder's Claim for Tax Distribution at 4.) This negative projection will likely be increased because of the letter being mailed out to all members as part of the Stipulated Preliminary Injunction with Asset Freeze. The letter offers members the choice of rescinding or modifying their membership contract. This option, if exercised by enough members, will severely and adversely affect the financial position of the Corporate Defendants. Finally, no lender has shown any interest in making cash advances to the Corporate Defendants at this time. (*See id.*)

Taking into account all of these circumstances and the fact that no party has offered, nor could they offer at this early stage in the proceedings, any concrete evidence quantifying with any degree of certainty the amount of money that may be needed to provide the Corporate Defendants' customers with redress, if that need arises, this Court finds it entirely appropriate to allow the asset freeze to remain in effect. Therefore, as of now, no distribution from MRII or any of the other Corporate Defendants

---

[8] Because the exact value of the Corporate Defendants' assets is unknown, at this time it is unclear whether Litchfield is fully secured.

should take place.

This result cannot be considered "fundamentally unfair" by any stretch of the imagination. Claveau chose to have MRII and V-Pac elect treatment under subchapter S for some beneficial reason. And Claveau has stipulated that evidence will likely prove that he knew that his companies were defrauding innocent consumers. Consequently, it seems only fair for this Court to take appropriate measures pending the outcome of this case to assure that any defrauded consumers can obtain redress. With regard to the risk of accruing tax penalties, this risk fairly falls on Claveau under the circumstances. After all, it was Claveau who made the choice to accept this kind of risk when he decided to have MRII and V-Pac elect tax treatment under subchapter S, and it was Claveau who has enjoyed the tax benefits of that decision. In so doing, Claveau must bear the risk of incurring tax liability without a distribution from MRII and the other Corporate Defendants.

Of course, we are not foreclosing all opportunities for Claveau to receive a tax liability distribution. Claveau's request is simply very premature. In short, Claveau has not provided this Court with sufficient evidence to make an informed determination of the amount of funds needed to assure the existence of an adequate redress fund. Until Claveau presents such evidence, this order stands.

## B. Distribution

Even if the asset freeze were not in place, this Court still would order the Receiver to deny Claveau's request for a tax liability distribution under Virginia corporate law.[9] Section 13.1-653 of the Virginia Code prohibits a board of directors from distributing money to shareholders if, after giving it effect, "[t]he corporation would not be able to pay its debts as they become due" or "[t]he corporation's total assets would be less than the sum of its total liabilities." Va. Code Ann. § 13.1-653(A), (C) (2000).[10] These limitations on distributions to shareholders, which mirror those found in the 1984 version of the Model Business Corporation Act, protect creditors by regulating the financial conditions under which the board of directors may make distributions. See Model Bus. Corp. Act Ann. § 6.40, at 6-214 (1998). The limitations provide a minimal level of protection to the corporation's creditors.

When determining whether the corporation is solvent in the balance sheet sense or "equity" sense under section 13.1-653(C)(1)-(2), the board of directors must consider circumstances that indicate that the corporation is in an uncertain or difficult position, including the existence of pending

---

[9] Because Claveau seeks the distribution from MRII, a Virginia corporation, we analyze this issue only under Virginia law.

[10] The effect of a distribution is measured as of the date the distribution is authorized if the payment occurs within 120 days after the date of authorization. See Va. Code Ann. § 13.1-653(E)(3). Claveau seeks a distribution by December 31, 2000.

litigation. *See, e.g., In re Storage Tech. Corp.*, 51 B.R. 206, 208 (Bankr. D. Colo. 1985) (rejecting debtor's request that lawsuits should not be considered in determining insolvency); *see also, e.g., Commonwealth Transp. Comm'r v. Matyiko*, 481 S.E.2d 468, 470-73 (Va. 1997) (distribution made to director despite the existence of a liability). Failure to do so may result in personal liability for the board of directors unless the violation is excused. *See* Va. Code Ann. § 13.1-653(D) (allowing the board of directors to avoid personal liability if their decision to make a distribution is based on certain financial statements, a fair valuation, or other reasonable methods).

The reasons for not modifying the asset freeze apply equally here. The only difference is that our focus here is on Litchfield, as secured creditor, and the defrauded consumers, as probable unsecured creditors. As all parties apparently agree, and as described above, the Corporate Defendants are in a precarious position. Presently, a positive cash flow is being generated. But a large contingent liability--the pending litigation--hovers closely overhead.

All of the parties, as well as this Court, can only speculate as to what events will unfold. Under present conditions--i.e., the receivership, closing of sales offices, etc.--the financial position of the Corporate Defendants in 2001 is largely unknown. Adding to this uncertainty, as mentioned earlier, is the letter being sent to all members as part of the

Stipulated Preliminary Injunction. This letter, which allows members to rescind or modify their membership contract, could significantly reduce the Corporate Defendants' membership base, increase operating costs an additional $750,000 in 2001, and substantially reduce note revenues--the principal source of funds available to pay the Corporate Defendants' overhead and operating expenses. Moreover, the Corporate Defendants have yet to open a successful sales office to generate new revenues since the receivership.

Considering all of these facts, the Corporate Defendants cannot be considered "solvent" in either the equity or balance sheet sense. No one has persuaded this Court otherwise. This is certainly not the time to cut the Corporate Defendants' operating cash in half, as Claveau asks this Court to do. Consequently, because of the pending litigation, no tax liability distribution can be made to Claveau under Virginia law.

In sum, the predicament in which Claveau finds himself is largely self-imposed, and the denial of any tax liability distribution, under the circumstances, is certainly not "fundamentally unfair." Instead, the denial of the tax liability distribution is needed to assure effective final relief and is required under Virginia corporate law. This is precisely the reason for the asset freeze and appointment of receiver.

Two risks are exposed here. First, the risk that defrauded consumers or innocent secured parties may be without an adequate remedy. That risk is potentially millions of dollars. Second,

the risk that Claveau, if ultimately found not liable, or if the preliminary injunction with asset freeze is otherwise dissolved, may be assessed tax penalties because the distribution is not made. That risk is probably thousands of dollars. Based on the record before us, the risk is properly allocated to Claveau not only under the law but also out of fairness.

As mentioned, this decision does not foreclose Claveau from seeking a distribution at a later date when more facts are known. If, in fact, it is true that the Corporate Defendants' financial position is as strong as Claveau claims it to be, and Claveau shows that any claims by defrauded consumers and innocent creditors will be adequately provided for, then, in the end, Claveau should have access to whatever amount of money he needs to pay any tax liability or penalty.

## III. Conclusion

For the foregoing reasons, this Court orders the Receiver, Stephen T. Bobo, to deny Claveau's request for a tax liability distribution.

ENTER ORDER:

_/s/ Martin C. Ashman_
MARTIN C. ASHMAN
United States Magistrate Judge

Dated: December 22, 2000.